# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~
In re
**PHILLIP A. ROMANO**                    Chapter 7
    Debtor                          Case No. 04-11263-JNF
~~~~~~~~~~~~~~~~~~~~~~~~~~~
**KEVIN J. FARLEY, and**
**ALLSTATE CARTING, INC.,**
    Plaintiffs
v.                                       Adv. P. No. 04-1129
**PHILLIP A. ROMANO,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~
In re
**DIANNE M. ROMANO,**                     Chapter 7
    Debtor                          Case No. 05-16880-RS
~~~~~~~~~~~~~~~~~~~~~~~~~~~
**KEVIN J. FARLEY, and**
**ALLSTATE CARTING, INC.,**
    Plaintiffs
v.                                       Adv. P. No. 05-1546
**DIANNE M. ROMANO,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Amended Complaint of Kevin J. Farley ("Farley"),

individually, and as a fifty-percent shareholder of Allstate Carting, Inc. ("Allstate"), against

the Debtor/Defendant, Phillip A. Romano ("Romano" or the "Debtor"), the President and

other fifty-percent shareholder of Allstate. Through his Amended Complaint, Farley seeks

1

a determination that a debt owed to him or to Allstate by Romano is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(4).[1]

Farley also filed a nearly identical Complaint against Romano's spouse, Dianne M. Romano ("Mrs. Romano"), seeking similar relief, although Mrs. Romano was never a shareholder of Allstate.  Judge Somma entered an order on May 11, 2006 assigning and consolidating the trial in Adv. P. No. 05-1546 with Adv. P. No. 04-1129. Neither Farley's Amended Complaint against Romano nor his Complaint against Mrs. Romano contains separate counts.

In April of 2004, Farley objected to Romano's claimed homestead exemption with respect to his residence located at 38 Crane Neck Street, West Newbury, Massachusetts (the "West Newbury property"), which he owns with Mrs. Romano as tenants by the entirety. At the request of the parties, on June 14, 2004, the Court consolidated the contested matter arising from Farley's objection to the Debtor's homestead with the adversary proceeding.[2]

_____

[1] On August 27, 2004, the Court granted a motion to consolidate Farley's adversary proceeding against Romano with one filed by Casella Waste Management of Massachusetts, Inc. ("Casella") in which Casella sought to except from discharge indebtedness owed on the grounds that Romano misrepresented the accounts receivable and fraudulently collected assets sold to Casella.  On October 28, 2005, the parties jointly sought a Separate and Final Judgment of all claims between Casella and Romano and to affirm a settlement agreement.  This motion was denied on April 3, 2006, and the adversary proceeding commenced by Casella remains pending.

[2] Mrs. Romano also claimed an exemption in the West Newbury property, and Farley objected to it.  On October 25, 2005, Bankruptcy Judge Somma entered the following order with respect to Farley's objection:
 Objection to claim of exemptions overruled for the reasons stated on the
   record. All rights and claims of each party with respect to the underlying

2

The Court commenced a three-day trial on March 21, 2006. At the beginning of the trial, the parties represented that they intend to liquidate the amount of any debt determined to be nondischargeable in state court. At the conclusion of trial on May 30, 2006, Farley and Allstate, through counsel, waived any causes of action against Romano or Mrs. Romano under 11 U.S.C. § 523(a)(6).

Seven witnesses testified at the trial and thirty exhibits were introduced in evidence. The issues presented include: 1) whether the Romanos used false pretenses, made false representations, or engaged in actual fraud to induce Farley to loan money to Allstate; 2) whether the Romanos owed either Farley or Allstate a fiduciary duty within the meaning of 11 U.S.C. § 523(a)(4); and 3) whether the Romanos embezzled funds from Allstate. For the reasons set forth below, the Court concludes that Farley, individually and derivatively as a shareholder of Allstate, failed to satisfy his burden of proof under 11 U.S.C. § 523(a)(2)(A). Although the Court concludes that Farley failed to establish that the Romanos' conduct warrants a finding of fraud or defalcation while acting in a fiduciary capacity, the Court concludes that the evidence established that they embezzled funds belonging to Allstate. The Court now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

---

litigation are fully reserved (including Farley's right to look to the Debtor's exempted equity to satisfy any judgment insofar as permitted under state law) provided that the Court's ruling regarding the exemption objection is not intended as a determination of any such rights or claims.

## II. FACTS

In the mid-1990's, Romano began operating a waste collection, hauling, and disposal business as a sole proprietor.  He incorporated the business as a Massachusetts corporation in the late 1990's as Allstate Carting , Inc. and was originally its sole shareholder, officer, and director.  From approximately 1996 to 1999, Mrs. Romano kept the books and records for Allstate.   Mrs. Romano reconciled the company's checkbook with the help of an accountant and invoiced Allstate's customers while Romano , who conceded he lacked bookkeeping skills, ran the day-to-day operations and collected money from customers. At this time, both Romanos were in charge of the company's checkbook and both wrote checks.  They used company checks to pay both business and personal expenses, including car payments, life insurance payments, and personal credit cards.  That practice continued after Farley became involved with Allstate, with Farley's knowledge.

Romano financed Allstate's operations through a number of loans and credit lines from various institutions and lenders.  He testified that Allstate obtained loans from Danvers Savings Bank, GE Capital, Ford Motor Credit, Wells Fargo, Sterling Bank, GMAC, Sovereign Bank, and Cocheco Falls Asset Management Company ("Cocheco Falls").  Most of the loans were secured by either Allstate's vehicles or its equipment.  Additionally, most of Allstate's lenders required Romano to personally guarantee the loans.  Romano testified that "[a]ny note I ever got from a bank I always had to sign for it personally."  (Tr. Day 1, at 126).

Neither of the Romanos knew whether Allstate was profitable prior to 2001.

4

Romano believed that the company was doing well financially because its bills were being paid, while Mrs. Romano testified that she believed that the company was doing well because it had sufficient income to pay salaries and expenses. Allstate's 2001 tax return, however, reflected that the company lost $212,867. (Plaintiff's Exhibit 8).

Farley is a self-employed, certified public accountant doing business as Kevin J. Farley & Company, Inc., which he established in 1991. Through his company, Farley provides accounting, management consulting, and tax services.

In June 2001, Romano and Farley met though David Champagne ("Champagne"), the owner of Cocheco Falls, a company which provides funding for equipment leases. Cocheco Falls previously had loaned money to Allstate on three or four occasions when Romano approached Champagne seeking approximately $40,000 to purchase additional equipment for Allstate. At that time, Champagne did not have funds immediately available. As Cocheco Falls was one of Farley's clients, Champagne asked Farley to meet Romano and share in underwriting the loan. Farley agreed. He testified that he immediately liked Romano, and he and Romano enjoyed talking with one another.

Allstate's books and records were in disarray. Romano essentially operated Allstate from the dashboard of his service truck. Beginning in July of 2001, Romano employed Farley to provide management consulting and financial services to Allstate. Romano testified that he was interested in having somebody help him with the financial aspects of the business so that he could do what he did best, namely, driving the waste hauling trucks and "selling the stops." (Tr. Day 1, at 137).

5

While engaged as a consultant, Farley became aware of the Romanos' practice of writing checks for personal expenses out of the company account.  He also advised Romano that there was no equity in his assets, including his interest in Allstate. (Tr. Day 1, at 137).  Although no longer working at Allstate, Mrs. Romano kept Allstate checks at the West Newbury property and used them to pay for the couple's personal obligations, such as her automobile,[3] car insurance, life insurance, health insurance, and credit cards. The parties agreed that Mrs. Romano would send e-mails to Allstate's office listing the checks she had written so that Farley could record them into the computer. (Defendant's Exhibit 5).

Farley viewed Allstate as an opportunity to become involved with a small and potentially profitable business.  He began talks with Romano in November 2001 about becoming a shareholder.  Romano required assistance with tracking accounts payable, accounts receivable, and reconciling bank statements. He also wanted Farley to take steps to eliminate Allstate's high interest, short term debt by obtaining long term financing with the goal of increasing the company's cash flow.  By December 2001, the parties came to a verbal understanding as to the structure of a business arrangement whereby Farley would become a fifty-percent shareholder of Allstate.

At the time Farley and Romano began discussing the terms of a stock purchase, the Romanos did not have a precise idea as to how much money they had contributed or

---

[3]Although Mrs. Romano's car was titled in the company's name, she testified that it was strictly her private vehicle and not used by Allstate.

6

loaned to Allstate.  At the time of trial, they also were unable to testify unequivocally as to the amount of their contribution, although both insisted, in a conclusory fashion and without substantiation or documentation, that they had contributed more money to Allstate than they had received by way of disbursements or salaries.

Romano testified that he had guaranteed a loan to Allstate from the Institute for Savings in the sum of approximately $90,000 which was secured by a second mortgage on the West Newbury property.  He also asserted that he incurred credit card debt on behalf of Allstate in an amount which he estimated at $80,000 to $100,000.  In view of these estimates, he and Farley agreed that if Farley contributed $200,000, Farley would receive fifty-percent of the stock in Allstate and equal compensation.

On December 5, 2001, prior to the execution of a Stock Purchase Agreement, Farley loaned $40,000 to Allstate to alleviate cash flow problems.  (Plaintiff's Exhibit 2, at 3).  In return, Farley obtained a security interest in a " 88 Mack DM 6865X," although it is unclear whether he perfected that interest or whether the equipment was encumbered by a prior lien.  In addition, he made other small loans to Allstate to acquire office staples.

Farley began working at Allstate two days a week in mid-December 2001.  During that time, he ostensibly established systems in the office to prepare and mail invoices, instituted a policy of delaying payments to vendors on large accounts to increase cash flow, and worked on securing Allstate an Small Business Association ("SBA") loan.  Allstate, however, could not obtain an SBA loan because most, if not all, of its assets were pledged as collateral for outstanding loans.  Nevertheless, Romano was pleased with Farley's work

7

and testified that he felt the office "ran like a top." (Tr. Day 1, at 74-75).

In addition to working at Allstate, Farley became the Romanos' accountant and prepared their personal income taxes. As a means of reducing both Allstate's payroll tax obligations and the Romanos' personal income taxes, Farley recast Romano's salary as a draw, treating funds which Romano withdrew from the company as a return on investment from his initial contribution. This yielded a significant tax savings for the Romanos and resulted in refund for the 2002 tax year. (Plaintiff's Exhibit 10). Farley admitted that no restrictions were placed on the amount and frequency of Romano's draws. (Tr. Day 3, at 160). Additionally, because his compensation was recast as loan repayment, Romano could take a regular salary in addition to the draws against the company so long as Allstate remained indebted to him.

In December 2001, the Romanos, Farley, and Farley's wife had dinner together at a restaurant in Portsmouth, New Hampshire. Farley testified that dinner was primarily a social event so that his wife and Mrs. Romano could meet one another, while the Romanos testified that the dinner was primarily a business meeting where they expressed concerns about Allstate's ability to pay their personal obligations as it had done in the past. At trial, both Romano and Mrs. Romano asserted that Farley allayed their concerns by stating, "Don't worry, nothing will change." Thus, they understood that Allstate would be paying all their personal obligations. (Tr. Day 1, at 43, 71, and 150; Day 2, at 86 and 94). In contrast, Farley maintained that he would never would have said such a thing. He did, however, admit that he was aware of their practice of writing checks for personal

8

obligations and acceded to the practice because he believed that payments would eventually be equalized.

In January 2002, Romano hired Maureen Curtin ("Curtin") to answer the telephone and occasionally pick up the mail, which was delivered to a post office box in Groveland, Massachusetts.  Farley trained Curtin to send out bills using Quickbooks software, print payroll checks off the computer for employees, input payables, and review the driver's logs to set up invoices.  Curtin worked part-time and sometimes simply answered the company's portable telephones from her home next door to the Romanos' home in West Newbury.

At the time Farley became involved with Allstate, its checks for its bank account at Danvers Savings Bank were kept in four different locations.  Curtin was able to print payroll checks from the computer at Allstate's office in Ipswich, Massachusetts, Farley and Romano each carried checks with them, and Mrs. Romano kept and wrote checks at the couples' residence in West Newbury.  Mrs. Romano signed Romano's name to checks she wrote.  Later, in the spring of 2003 when it became necessary to open a second bank account at Banknorth, Matt Evangelista ("Evangelista"), one of Allstate's employees, also had access to and wrote checks on behalf of Allstate.

In winter 2001-2002, the Romanos began remodeling their home.  E-mails sent by Mrs. Romano to Farley between January 4, 2002 and March 6, 2002 reveal that both the contractor and suppliers for the renovation were paid from Allstate's bank account with Allstate's Funds.  (Defendant's Exhibit 5).

9

By the end of March 2002, Mrs. Romano ceased e-mailing Farley with respect to the checks she was writing.  (Defendant's Exhibit 5).  Mrs. Romano testified that she ended the practice "because these e-mails went to Allstate Carting, and [Farley] wasn't at the office . . .[so] . . . I had no way to e-mail him unless I had his e-mail address at his home."  (Tr. Day 2, at 79).  Instead, Mrs. Romano testified that she either called Farley or, if she could not reach him, she would write down the payee and the amount of the check and give it to Romano to give to Farley. (Tr. Day 2, at 81).

Once the e-mails stopped, Farley testified that it became increasingly difficult for him to manage the books.  He stated:

> [I]t just became much more difficult.  Everything was done after the fact. . . I was not given any current information regarding the activities in the bank account.  Mr. Romano would write checks that he would forget to notify me of.  Obviously I had no idea what Ms. Romano was writing checks for. . . every once in a while she would write notes and . . . they sometimes would come with Mr. Romano in from his truck and sometimes they wouldn't. . . . I was getting certainly only pieces of information. So it just became more and more inherently difficult to manage the day-to-day cash flow.

(Tr. Day 2, at 195).  While Farley did receive bank statements with canceled checks, there were occasions when Romano left the statements in his truck.  As a result, maintenance of Allstate's checkbook and other books and records was not current and was, in fact, delayed 30 to 45 days.

Farley did not become an Allstate  shareholder until May 2002 due to delays in drafting the corporate documents.  On May 14, 2002, Farley met with Romano to sign the stock purchase agreement.  At the closing, Allstate was represented by Attorneys Mark

Janos ("Attorney Janos"), Steven Merritt ("Attorney Merritt"), and Bethany Jane Raffa ("Attorney Raffa") of the Law Offices of Mark Janos.  Farley was unrepresented.

Farley executed a Letter Agreement in which he acknowledged that "[t]he undersigned can afford a complete loss of my investment in the Shares and is able to bear the economic risk of holding the Shares for an indefinite period."  Farley also executed a Subscription Agreement, pursuant to which he received 100 shares, no par value, of the common stock of Allstate, which had authorized capital stock consisting of 200,000 shares of a single class of common stock, in exchange for $200,000 payable in full on demand, and a Stock Restriction Agreement.  (Plaintiff's Exhibit 1, Defendant's Exhibit 7).  The payment was structured as a Demand Note (Defendant's Exhibit 7, Exhibit D) secured by a Stock Pledge Agreement and a Loan and Security Agreement.  (Plaintiff's Exhibit 1, Defendant's Exhibit 7, at Exhibits B-D).  As a practical matter, if Allstate needed money, Romano could make a demand upon Farley for a contribution, either verbally or in writing, requiring him to pay the note in full.  Attorney Raffa, the drafter of the agreement, testified that once the agreement was signed, "[i]t was Mr. Romano and Mr. Farley 50/50."  (Tr. Day 2, at 148).  Until the stock was paid for, however, Romano retained voting rights with respect to the stock.  (Defendant's Exhibit 7, at Exhibit B, at 3).  Despite the agreements executed by Farley and Romano setting forth their respective rights and obligations, Romano testified: "Shareholder doesn't mean anything to me.  He didn't put the money in." (Tr., Day 1, at 38).

On May 23, 2002, Farley entered into an Employment Agreement whereby he

11

became the Controller of Allstate.    (Defendant's Exhibit 6).    Paragraph 2.A. of the

agreement set forth his duties, which included responsibility for "the day to day financial

operation of Allstate Carting, Inc."   Id. at 1.   Paragraph 4, titled "Other Employment,"

expressly recognized that Farley "shall continue to be involved in Kevin J. Farley and

Company, Inc., and . . . shall maintain his role in that company and financial industry so

long as it does not deplete, take away from , or otherwise divert corporate opportunities

from Allstate Carting, Inc."   Id. at 2.   The agreement also set forth a salary and bonus

mechanism, stating in relevant part:

> Compensation shall be equal to a sum determined and agreed
> to by Phillip Romano, President of Allstate Carting, Inc. and
> Kevin Farley, Controller of Allstate Carting. . . It is
> contemplated by the employer and employee that Kevin Farley
> and Phillip Romano shall equally contribute to the benefit and
> profitability of Allstate Carting, Inc., and the bonus, if any,
> shall be divided equally unless otherwise agreed upon by
> Phillip Romano and Kevin Farley in their respective capacities
> as corporate officers.

Id. at 3.  Paragraph 14 of the agreement provided that the "contract supercedes all prior

contracts and understandings between the Employee and the Company. . . "  Id. at 6.

Romano also signed an employment agreement as President, which contained essentially

the same terms as the agreement between Allstate and Farley.  Romano testified that he

worked very long hours and devoted himself to his business.  In his words, "I worked at

Allstate Carting.  Allstate Carting was me." (Tr. Day 1, at 88).

Romano testified that "there was [sic] no set salaries, really," after the stock

purchase.  (Tr. Day 1, at 154).  Prior to the winter of 2002-2003, Allstate paid Romano

12

between $1,100 to $1,400 dollars per week.  Farley took an equal salary for a short period

and then ceased doing so when the company could no longer afford to pay both salaries.

Farley chose not to take a salary or any benefits believing that his proportionate share of

company profits would be paid either from sale proceeds or when its cash flow improved.

He testified that he and Romano were to get equal compensation.  He explained:

> That means that any remuneration be [sic] received, whether it be benefit by
> direct payment to the stockholder or through benefits like insurances,
> vehicles that were provided, you know, gas that was provided, any benefits,
> you know, inured to each of the stockholder it would, you know, tally them
> up on skid sheets and you just kind of keep track of it.

(Tr. Day 2, at 185).  Accordingly, Farley kept a running tally of all benefits afforded to

Romano and Mrs. Romano  (Plaintiff's Exhibits 5 and 7), as well as his contributions and

loans to the company. (Plaintiff's Exhibit 2). Although he testified that he prepared these

records contemporaneously, on cross-examination he admitted that they had been revised

periodically in preparation for trial.  (Tr. Day 3, at 92-93).  With respect to his personal

contributions, he did not include any loans or contributions which had been repaid by

Allstate.  Moreover, he did not disclose that as a corporate officer he signed a contract for

the acquisition of two snowmobiles by Allstate, one for Romano and the other for him.  He

testified that that expenditure was "judicious because the two of us agreed to it, and we did

it, yes."  (Tr. Day 3, at 161).

In the early summer of 2002, Allstate purchased East Coast Disposal Service ("East

Coast") from Christopher Emery ("Emery").  Allstate acquired East Coast's phone number,

clients, and 150-200 containers for approximately $80,000, payable in the amount of $8,000

13

per month.  Allstate also employed Emery as a truck driver and mechanic beginning in

June of 2002.  Pursuant to his employment agreement, Emery's salary was paid in cash.

On June 14, 2002, at Romano's request, Farley signed an Assumption Agreement

whereby Allstate formally assumed the personal debt Romano had acquired on behalf of

the corporation.  (Defendant's Exhibit 1).  Pursuant to the agreement, Allstate assumed a

Residential Note and Mortgage held by the Institution for Savings which was secured by

the Romanos' West Newbury property. Id. (The monthly payment was $2,142.48.

(Plaintiff's Exhibit 6).)  The agreement contained a reference to a Schedule of Obligations

to be attached as Exhibit A.  The Romanos testified that Exhibit A was to contain a list of

credit card obligations which they incurred on behalf of Allstate.  The Exhibit, however,

was never prepared.  Attorney Raffa testified that "the information that . . . [she] needed

was never provided to [her] by Mr. Romano or Mr. Farley."  (Tr. Day 2, at 124).

Romano testified that from May 15, 2002 through June of 2003, he consistently asked

Farley for money.  In his words, Farley "never refused.  He beat around the bush."   At

trial, Farley produced a spreadsheet listing his contributions and loans to Allstate.

(Plaintiff's Exhibit 2).  The exhibit shows that Farley characterized all his transactions with

Allstate as loans.  Indeed, prior to executing the Subscription Agreement and becoming a

shareholder, he loaned the company $40,468.61.  Through his wife's companies or his

accounting firm, he contributed approximately $243,000 thereafter to Allstate. Id.

According to Farley's "Transactions by Account," he contributed a total of $284,110.36 to

Allstate, including interest payments with respect to credit card purchases, in the form of

14

loans which he offset against the $200,000 "debt" pursuant to the Stock Purchase Agreement. After accounting for the $46,000 payment from the escrow account created in conjunction with the sale of Allstate's assets, which will be discussed below, Farley maintains that he is owed approximately $17,500, exclusive of the capital contribution of $200,000 for the stock.

In December 2002, Farley was diagnosed with Graves Disease, a thyroid condition which affected his ability to devote time to Allstate's business affairs. The parties disputed the length of his absence from Allstate. Farley testified that he was ill for approximately two to three weeks before he was diagnosed, and that it took an additional two weeks for him to adjust to his medication. Emery corroborated Farley's testimony, in part, noting that he observed Farley at the office two to three times a week until November 2002. After that time, Emery noticed that Allstate's office was in shambles.

In contrast, Romano asserted that Farley was absent from the office from October 2002 to February 2003. He testified that during Farley's absence "[t]he office was in turmoil. The billing wasn't getting out." (Tr. Day 1, at 163). Farley insisted that there was never a time when invoices did not go out. Curtin testified that the only time she did not send out invoices was in September and October 2002, when she was instructed not to do so by Farley. (Tr., Day 3, at 10).

Farley maintained that he did not miss any critical time at Allstate due to his illness. He testified that he was doing all his work and was in daily communication with personnel from Allstate. Curtin testified that Farley had remote access to the office computer and that

he was capable of paying bills from his accounting office in New Hampshire.  Farley
further testified that he "became the point guy in dealing with Mr. Danny DeVito," the
manager of Predera Enterprises, "and . . . continued to do that right through that whole
time."  (Tr. Day 2, at 187).  Nevertheless, Curtin testified that she was not always able to
reach Farley by telephone.

From January 2003 through June 2003, Allstate experienced significant cash flow
problems.  Romano testified that "Mr. Farley didn't do any billing in . . . months, and we
bounced a lot of checks."  (Tr. Day 1, at 54).  In March 2003, Romano and Evangelista
opened a new bank account at Banknorth "[b]ecause Danvers Bank shut [Allstate's]
account off because [they] owed too much money on it."  (Tr. Day 1, at 77-78).  Bank
statements and canceled checks show that Romano used both the Danvers Savings Bank
and the Banknorth accounts in the spring of 2003.  The new Banknorth account was initially
in the exclusive control of Romano and Evangelista, but Farley testified that he eventually
received checks and bank statements for that account.  The bank statements from Danvers
Savings Bank and Banknorth corroborate that Allstate wrote a considerable number of bad
checks.  As a result, Romano testified that various creditors, particularly the owners of
dumping sites, would only accept certified checks or cash.  A review of Allstate's canceled
checks for the months in question, however, reveals that Romano's assertion is overstated,
as numerous checks were made out to various vendors and waste dumps, including
ERRCO and Waste Management.

Farley noticed large amounts of money moving out of Allstate's checking account

16

at the Danvers Savings Bank.  Many of the checks were made payable to Romano, Mrs.

Romano, or cash.  Canceled checks and bank statements show that between January and

July of 2003, the Romanos wrote checks to themselves or cash in the approximate amount

of $200,000.  (Plaintiff's Exhibits 3 and 4). During the period prior to the sale of assets to

Casella, Romano testified that he was using cash to pay vendors and employees because

of the number of insufficient funds checks.  At trial, three witnesses testified to receiving

cash payments from Romano: Curtin, Emery, and Robert Derepentigny ("Derepentigny"),

a former vendor of Allstate.  Both Curtin and Emery testified that they always received

their weekly pay in cash.  Emery further stated that he received $15,000 in cash in partial

satisfaction of the debt owed for the purchase of East Coast after an Allstate check had

failed to clear the bank.[4]  Derepentigny, who did business as R & B Sandblasting, testified

that he insisted on cash payments for his services after receiving several bad checks.

Evidence presented at trial, however, established that he accepted checks from Allstate

through April 2003.[5]  (Plaintiff's Exhibits 3, at 11, 12, 68, and 72); (Plaintiff's Exhibit 4, at 13,

15, 19, and 46).  Derepentigny ultimately admitted that he accepted Allstate checks on a

regular basis, stating "I guess.  I didn't really look at them.  I just put them in the bank."

(Tr. Day 3, at 80-81).

––––––––––––––––––––

[4]Emery received this check in June and claims to have received cash  shortly after
the sale of East Coast, yet the canceled check shows that it was not presented for
payment until September 29, 2003.  (Plaintiff's Exhibit 3, at 95-96).

[5]On re-direct examination, Derepentigny attempted to explain that many of the
checks which he did accept were for materials, and in one case, damage caused to his
car by the driver of an Allstate truck, but not services.  His testimony was not credible.

17

Other than the testimony of Emery and Curtin, the Romanos failed to produce evidence to support their assertions that vendors and other employees were paid in cash. Allstate's bank statements and canceled checks reveal that Allstate regularly issued checks to employees and other vendors. Additionally, Farley presented evidence that several dump operators continued to accept Allstate's checks despite Romano's testimony to the contrary. ERRCO, a dump located in Andover, Massachusetts, for example, accepted check number 1076 in the amount of $35,420.45 on April 30, 2003. (Plaintiff's Exhibit 4, at 112). Transriver Marketing Co. accepted checks numbered 1093, 1094, and 1095 in May 2003. Id. at 102-103. Waste Management accepted check number 1056 on April 8, 2003. Id. at 75. Spartan Consolidated accepted checks numbered 1384 and 1043 in March and April 2003. Id. at 62-63. Predera Enterprises accepted checks numbered 1016 and 1017 in April 2003. Id. at 42-43. "Resco" accepted five checks in January 2003. (Plaintiff's Exhibit 3, at 23-27). Additionally, Allstate issued payroll checks through the first week of June 2003. (Plaintiff's Exhibit 3).

Farley admitted, however, that some dumps were demanding that Allstate pay in cash or certified check. (Tr. Day 3, at 121). In fact, Farley acknowledged a cash payment to ERRCO on March 6, 2003 in the amount of $1,900, as well as other certified checks on the spreadsheet he prepared with respect to his own financial transactions with Allstate. (Plaintiff's Exhibit 2); (Tr. Day 3, at 119-120).

Farley testified that by October 2002 he had determined that the sale of Allstate was the only solution to its financial difficulties, and Romano eventually agreed. Farley and

Romano then met with a representative of Casella.   Negotiations began in earnest in

February or March of 2003.

Before the sale, Romano testified that he continually asked Farley to put money into

Allstate, stating, "[we] need money to dump, we need to . . . maintain the customers." (Tr.

Day 1, at 22).   Farley then began contributing money and paying off the company's

creditors based on Romano's representation that Allstate needed the money for corporate

purposes. (Plaintiff's Exhibit 2). Farley testified that with every "loan" he made to Allstate,

Romano promised that "he'd be personally responsible to give [Farley] back the money

that he took out." (Tr. Day 3, at 153).  Romano further assured Farley that equalization of

all  funds would occur after the sale.

On February 27, 2003, the Romanos purchased a piece of property in Vermont for

$36,566.55. Mrs. Romano wrote a check in that amount, payable to cash, on that date from

the couples' personal checking account at Danvers Savings Bank. (Plaintiff's Exhibit 6, at

151).  Romano testified that he and Mrs. Romano received a $26,000 tax refund which he

"put into the business." (Tr. Day 1, at 54).  He admitted that he deposited the check, which

was in the exact amount of $24,072.76, into the couples' personal checking account, not

Allstate's business account, at Danvers Savings Bank.   The couple's personal checking

account reflects the deposit having been made on January 24, 2003.  Although both he and

Mrs. Romano testified that the tax refund was used for business purposes and that later the

company reimbursed them, the largest checks written that month from their personal

checking account do not necessarily reflect the payment of business expenses.  The largest

checks from the account identified in the January 2003 bank statement were as follows: $10,000 payable to Romano; $5,000 payable to P & S Truck Service; $1,000 payable to Reynolds Real Estate; $7,000 payable to cash; $4,700 payable to cash; and $5,000 payable to P & S Auto & Truck.  The couples' personal checking account also reflected payments to the Institution for Savings in the amount of $1,773.05. (Plaintiff's Exhibit 6).

At trial, neither of the Romanos could testify whether they had withdrawn more money than they had contributed to Allstate between May 2002 and June 26, 2003 when Allstate was sold.  Mrs. Romano testified that the only tally kept of how much the couple loaned or contributed to Allstate was in their heads, and that "Me and Phil would have never owed Allstate Carting money."  (Tr. Day 2, at 72).  She estimated that the entire sum contributed to Allstate from its inception to June 2003 was approximately $200,000.

Farley prepared spreadsheets showing that from the spring of 2001 disbursements made to Romano and Mrs. Romano for personal expenses totaled $71,728.57 and $455,254.88, respectively.  Farley's summaries of disbursements are not without flaws.[6] (Plaintiff's Exhibits 5 and 7).  As noted above, however, Romano and Mrs. Romano wrote checks to themselves or cash beginning in January of 2003 in excess of $200,000.  For

---

[6]At trial, Farley explained Plaintiff's Exhibits 5 and 7 as follows:
> This is the beginning of the schedule where I started listing those expenses that were written by the Romanos out of the Danver [sic] Savings account and segregating them into what was due from them.

(Tr. Day 2, at 203).  The starting point was determined based upon a review of prior tax records and conversations with the Romanos themselves.  Farley then went through the books and records and segregated expenses he did not recognize as Allstate's obligations based on the payee.

example, in January 2003, the Romanos wrote checks to cash or themselves from Allstate's

Danvers Savings Bank account in the total amount of $13,600. For February, March, April,

May, and June, 2003, the totals were $64,400, $9,000, $14,510, $49,600, and $9,500,

respectively.  In  March and April of 2003, the couple wrote checks to themselves or cash

in the amounts of $17,200 and $14,600, respectively, from the Banknorth account, which

was closed on June 5, 2003 with a balance of $10,600.83.  (Plaintiff's Exhibit 3 ).  Deposits

into the couples' personal checking account at the Danvers Savings Bank mirror the

disbursements made by Allstate, but do not account for all of them.  Thus, the January 2003

statement for their personal account at the Danvers Savings Bank shows credits of $13,700.

For February, March, April, May, and June of 2003, the credits totaled $40,735.61 (a sum

which includes the tax refund of $24,072.76), $57,300, $13,500.10, $3,200, and $16,925.18,

respectively.  For the same six month period in 2002, according to the statements for those

months, which were issued mid-month, the credits totaled $5,500.47, $3,800.20, $6,731.32,

$5,600.16, $5,166.58, and $10,900.77.  (Plaintiff's Exhibit 6). Mrs. Romano testified that she

"assumed what [they] wrote for salary and for . . . personal things . . . would be salary,"

and would never need to be paid back.  (Tr. Day 2, at 112).

Farley  testified  that  he  obtained  the  Danvers  Savings  Bank  records  for  Allstate

sometime after March of 2003, adding "I may not have seen them probably until after the

sale occurred." (Tr. Day 2, at 196).  He further testified that  recognized that a lot of cash

had been removed from the corporation in February.  He stated:

> I queried Mr. Romano.  I said, "Listen, you know, we've got to go down [sic]
> to this stuff.  We've got to figure out what . . . is going on.  I mean, I've got

to account for this stuff."  He kept telling me, "Yes, yes, yes.  They [the cash]
went to pay dumps.  They went to pay dumps."

(Tr. Day2, at 196).

Towards the end of May 2003, Attorney Raffa received the first draft of the Asset

Purchase and Assignment Agreement (the "Sale Agreement") from Casella.  In preparation

for the closing, Farley was responsible for providing necessary financial information, while

Romano provided equipment lists and kept the business operating.  According to Farley,

Romano also was responsible for providing up-to-date information about accounts payable

because he was paying some vendors without Farley's knowledge.  Farley prepared three

successive financial statements for the sale, all reflecting substantially different amounts

for Allstate's current debt.   The original statement, prepared in early June, was

unsatisfactory because it failed to show balances for the accounts payable.  The amended

version, dated June 11, 2003, reflected that Allstate's outstanding debt was approximately

$410,000, including a debt to Wheelabrator, a dump operator, in the sum of $362,028.31, but

excluding a $90,000 obligation to Romano pursuant to the handwritten notation "Phil

Romano 90K approx." Farley produced a further revised accounts payable summary dated

June 13, 2003 which listed Allstate's current debt at over $1.3 million.   This version

included a debt in the sum of $25,000 owed to David Champagne, $32,935.46 owed to

Evangelista, $20,000 owed to the Commonwealth of Massachusetts,  $120,000 owed to the

Internal Revenue Service, $45,000 owed to ERRCO, $45,000 owed to Predera Enterprises,

as well as large sums owed to Wheelabrator and Allstate's equipment and vehicle lenders.

It also included a debt in the sum of $253,000 owed to the Romanos.

On June 26, 2003, Farley in his capacity as Treasurer of Allstate, Romano in his capacity as President of Allstate, and representatives of Casella executed the Sale Agreement and closed the transaction. The effective date of the Sale Agreement was June 1, 2003, twenty-five days earlier than the date of the closing. (Defendant's Exhibit 16, at 1). The purchase price for the assets was $900,000, plus an amount for the accounts receivable calculated as set forth in paragraph 2.2 of the agreement. Id. at ¶2.2, at 3. The Sales Agreement provided the following:

> In addition to the Purchase Price, the Buyer shall purchase from the Seller all of the Accounts Receivable of Seller. The Accounts Receivable Purchase Price shall be calculated as follows: (a) 100% for any receivables under 30 days old, (b) 75% for receivables over 30 days old but under 60 days, and (c) zero for receivables over 60 days old. As to accounts receivable of Seller that are advanced billed, the calculations are as follows: (a) zero for any receivables where the customer has been billed and the receivable is reflected in the aging but no services have been provided, (b) 100% for any receivables under 60 days old, (b) [sic] 75 % for receivables over 60 days old but under 90 days, and (c) [sic] zero for receivables over 90 days old. . . .

Id.

As part of the Sale Agreement, Romano and Farley were required to make certain representations to Casella, including the representation that Allstate was solvent, that it was an operating business, and that no liens encumbered its assets other than those which had been disclosed. Id. at ¶ 5.1.10, at 8. The Sale Agreement, which provided that "all exhibits and schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement," also provided for the creation of escrow accounts out of the sale proceeds for taxes, for the Wheelabrator account, and for secured creditors. (Defendant's Exhibit 16, Schedules G-I). Schedule I (UCC Escrow) provided that the

23

Escrow Agent, Attorney Janos, "agrees to receive from Buyer [Casella], deposit and hold

in its [sic] firm trust account the sum of Two Thousand Forty-Six Thousand One Hundred

Ninety-Six and 97/100 Dollars ($246,196.97) (the "UCC Line Creditor Escrowed Funds"),

intended to represent the UCC Line Creditor Escrow, pending disposition in accordance

with the provisions of the Agreement."  It also provided that the Escrow Agent "agrees to

receive from Buyer, deposit and hold in its [sic] firm trust account the sum of One Hundred

Four Thousand Six Hundred Two and 90/100 Dollars ($104,602.90) (the "Net Proceeds

Escrowed Funds"), intended to represent the Net Proceeds Escrow, pending disposition

in accordance with the provisions of the Agreement."   A $25,000 escrow also was created

to account for any variances in the accounts receivable.  The Sale Agreement  included

schedules setting forth Allstate's equipment, customer contacts, as well as a "List of Liens."

According to this document, secured creditors, identified as UCC secured creditors, totaled

$246,196.97.  Additionally, "Non-UCC Commitments" totaling $549,200.47 were set forth

as follows:

| | | |
|---|---|---|
| G. Mello Disposal Corp. | Notification of Amt. Due | 5,810.24 |
| Predera Enterprises, Ltd. | Court Ordered Escrow | 60,000.00 |
| Cellai & DeNauw, LLP | Agreed Settlement | 9,931.96 |
| Donald F. Knowles, Inc. | Account Due | 39,993.73 |
| Mark Janos Escrow Agt. | Agreed Escrow/Taxes | 200,000.00 |
| Mark Janos Escrow Agt. | Agreed Escrow/Wheelabrator | 200,000.00 |
| Casella Waste Mgmt. | Outstanding Account | 33,464.54 |

The second mortgage on the Romanos' West Newbury property, which Allstate had

assumed, was not listed. Unbeknownst to either Casella or Farley, however, Romano met

with Attorneys Janos and Merritt prior to the sale for the purpose of filing UCC documents

24

granting Romano a security interest in all of Allstate's assets with respect to its assumption of the second mortgage on the Romanos' West Newbury property.  According to her billing records, Attorney Raffa filed UCC statements on June 16, 2003, shortly before the sale.  She testified as follows:

> [Q]uite frankly, I don't know why they were filed.  I filed them pursuant to . . . my firm's decision.  I filed them but I don't know why, quite frankly, they were filed. . . I couldn't say for sure whether or not there was [an allowed security interest by the debtor] or not.

(Tr. Day 2, at 130-131).

Despite the representation in the Sales Agreement that Allstate was solvent, it was not.  Farley in a letter prepared in conjunction with a settlement with Wheelabrator, dated June 20, 2003, stated the following "under the pains and penalties of perjury":

> My name is Kevin Farley, and as the Controller of Allstate Carting, Inc., I have personal knowledge of the facts set forth in the affidavit.
>
> *Allstate Carting is currently an insolvent company* whose debts outweigh its assets.  The current debt of Allstate Carting is 1.75 million dollars.  This is the best current estimate based upon outstanding debts and liability. [sic] It is possible that this debt could be subject to additional debts.
>
> The current net worth of available assets to satisfy this debt is $960,000.00.  This includes all available means in which to pay the debts of the corporation.  Currently Allstate has secured debt, tax debt, and outstanding payroll along with unsecured claims.  The estimated secured debt is approximately $520,000.00.  There is approximately $135,000.00 of debt to the Internal Revenue Service and $32,000.00 owed to the Commonwealth of Massachusetts, as well as the current outstanding payroll due to employees is approximately $93,600.00. [sic] The remaining debt appears to be unsecured debt and legal fees.
>
> This affidavit is made for the purpose of disclosure to of Resco-Wheelabrator [sic] and is executed with the understanding that this affidavit will be kept confidential and used only to effectuate the settlement of a debt.

25

(Defendant's Exhibit 11)(emphasis supplied).    Thus, the transfer of a security interest to Romano was fraudulent as to Allstate's unsecured creditors.

From June 1, 2003, the effective date of the Sale Agreement, and continuing past the closing, Romano collected on behalf of Allstate accounts receivable which had been sold to Casella pursuant to the Sale Agreement.    Romano testified that these funds were used to pay creditors and keep Allstate operating.    Farley, however, testified that, as of June 1, 2003, Casella had assumed management of Allstate, both financially and operationally.

In a letter dated September 29, 2003, Casella demanded an additional $94,482.18 beyond the escrow amount to "true up" the accounts receivable.    (Defendant's Exhibit 17). Casella eventually sent Allstate and Romano a demand letter, dated April 8, 2004, in which it asserted that "Phillip Andrew Romano, Jr. and Kevin J. Farley, both personally and through Allstate, defrauded Casella of a sum totaling $119,482.18."    It added:

> When Casella purchased the accounts receivable, Allstate continued to collect on the A/R balance after the June 1, 2003 closing and absconded with funds equaling $57,896.21.    Allstate also failed to notify Casella of an outstanding amount that had already been placed in collections, resulting in the further overvaluing of it's A/R balance by the sum of $621.50.    Due to the four separate misrepresentations and/or fraudulent acts, the A/R balance was overvalued by a total of $108,199.81.    Allstate also represented to Casella that all of the containers at its storage facility and all of its containers in the field were empty, which was later discovered to be false.    The disposal fees for the full containers totaled $11,282.37. With the setoff of the contingency reserve withheld by Casella ($25,000.00), the net amount due to Casella is $94,482.18.

One day after the closing, on June 27, 2003, Attorney Raffa delivered a check from an escrow account, presumably the Net Proceeds Escrow, payable to Romano in the amount of approximately $84,000.    The Romanos used proceeds to satisfy the note and

mortgage to the Institution for Savings.  Neither Attorney Raffa nor Romano informed Farley of the disbursement even though he had previously instructed Attorney Raffa not to disburse any funds from the escrow accounts without joint authorization.  Attorney Raffa testified that Farley consented to the disbursement several days later when she issued, and he accepted, a check from the escrow account in the amount of $46,000 in partial satisfaction of loans he made to Allstate.  Farley testified that he never consented to the repayment of the Romanos' mortgage, and would not have done so due to the amounts taken by the Romanos prior to the sale.  Romano testified that he had discussions with Farley about the repayment of the mortgage prior to the sale, and that it was his understanding that regardless of what Allstate had previously disbursed to him, he was entitled to full repayment of the debt as a result of the Assumption Agreement.

The purchase price of the assets was insufficient to pay off Allstate's creditors in full. Allstate was insolvent at the time of the sale to Casella, and it was in the zone of insolvency for a substantial period of time before then.  Farley prepared a listing of unpaid bills, dated September 4, 2003, showing $547,467.97 in aged accounts payable, and he recognized that Allstate was in financial difficulty throughout his tenure as Controller.  (Tr. Day 3 at 126). Although it is unclear how accurate Farley's records are, Allstate failed to pay substantial debt to its unsecured creditors, while at the same time both of its shareholders had caused Allstate to make substantial distributions for their benefit.  In particular, Farley did not refuse the $46,000 payment made by Attorney Raffa following the sale to Casella.

On February 20, 2004, Romano filed a Chapter 7 bankruptcy petition in the District

27

of Massachusetts. Mrs. Romano filed her Chapter 7 petition on August 1, 2005.

## III. POSITION OF THE PARTIES

    A. <u>Farley</u>

Farley, individually and on behalf of Allstate, seeks to except a debt he asserts is owed by the Romanos from discharge on three alternative grounds: 1) that the debt is for money obtained by false pretenses, false representations, or actual fraud; 2) that the debt arose from their defalcation while acting in a fiduciary capacity; and 3) that the debt arose from embezzlement. Farley asserts that Romano uttered numerous false statements with the intent to induce him to make loans to Allstate. He argues that Romano's representations that Allstate's creditors would only accept cash payments and that he made such cash payments were false. He also maintains that Romano falsely represented Allstate's financial status by stating that it needed money to pay creditors while he was simultaneously withdrawing large sums from Allstate's business accounts. Farley contends that Romano represented that he would assume personal responsibility for unpaid loans owed by Allstate to Farley, and he asserts that Romano lied when he agreed that they would equalize distributions when the company was sold. Finally, he asserts that Romano's failure to inform him of his intention to obtain a disbursement from the escrow account after he had instructed Romano and Attorney Raffa not to disburse funds without his consent was a false representation.

In support of his claim that Romano committed a defalcation while acting in a fiduciary capacity, Farley relies on cases such as <u>M-R Sullivan Mfg. Co. v. Sullivan (In re</u>

Sullivan), 217 B.R. 670 (Bankr. D. Mass. 1998), and Compugraphic Corp. v. Golden (In re Golden), 54 B.R. 957 (Bankr. D. Mass. 1985), for the proposition that, as an officer of Allstate, Romano had a fiduciary duty to the corporation for purposes of 11 U.S.C. § 523(a)(4). Farley further contends Massachusetts law imposes a fiduciary duty of "the utmost good faith and loyalty" on shareholders of a closely held corporation. Demoulas v. Demoulas, 428 Mass. 555, 578 (1998) (quoting Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 408 (1995)). Farley asserts that Romano's inability to either produce the funds held in trust or satisfactorily account for them constitutes a defalcation.

Farley also argues that the Romanos' withdrawal of substantial sums from Allstate's checking account for personal expenses amounts to embezzlement under 11 U.S.C. § 523(a)(4). Farley further argues that Mrs. Romano acted in concert with Romano and was an active participant in his defalcation and scheme to defraud Farley. As such, Farley seeks a determination that any Allstate funds she received are a nondischargeable debt in her bankruptcy.

In seeking to deny the Romanos a homestead exemption, Farley relies on Carlson Orchards, Inc. v. Linsey (In re Linsey), 296 B.R. 582 (Bankr. D. Mass. 2003), in support of his contention that a homestead exemption be allowed if it is proven that Romano embezzled money for the acquisition or improvement of the homestead.

B. The Romanos

The Romanos argue that Farley has failed to prove any of the requisite elements of causes of action under 11 U.S.C. § 523(a)(2) and (a)(4). First, the Romanos contend that

29

Farley failed to set forth any false representations purportedly made by Romano to obtain money, and that there is no evidence at all of any representations made by Mrs. Roman to Farley.    Additionally, Romano maintains that Farley's testimony that he guaranteed repayment of Farley's loans to Allstate, without more, does not indicate an intent to defraud.  As a certified public accountant with knowledge of both Allstate's financial and the Romanos' personal finances, they contend that Farley was not justified in relying on any alleged representations.

Romano relies on cases such as <u>Rothman v. Bebeer (In re Bebeer)</u>, 239 B.R. 13 (Bankr. E.D. N.Y. 1999) and <u>Detroit Auto Brokerage, Inc. v. Denson (In re Denson)</u>, 7 B.R. 213 (Bankr. E.D. Va. 1980), for the proposition that a co-shareholder does not breach a fiduciary duty or embezzle when he pays personal expenses with corporate funds or takes a larger than agreed upon draw when these activities are done openly and routinely.  Moreover, the Romanos maintain that at no point in time did Mrs. Romano ever owe a fiduciary duty to either Allstate or Farley.

With regard to the alleged embezzlement, Romano asserts that intent to defraud has not been proven as he used the funds he withdrew from Allstate to pay its debts.  Romano also contends that Farley's request for relief should be denied as he acquiesced and participated in the activities of which he now complains.

The Romanos also argue that Farley's Objection to their homestead exemption should be denied because he failed to meet his burden under Bankr. R. Fed. P. 4003(c).

## IV. DISCUSSION

### A. Introduction

At the outset, certain preliminary factual and legal considerations color the issue

before the Court, namely whether any debts owed by the Romanos to Farley or to Allstate

are nondischargeable.   These considerations include the fiduciary duties owed by

shareholders to each other and to the corporation they own, and the relationship of these

fiduciaries duties defined by state law to the existence of "fiduciary capacity," defined

under federal law for purposes of 11 U.S.C. § 523(a)(4).   Another consideration is whether

the Romanos loaned money to Allstate or made capital contributions to Allstate, and

whether, to the extent they made loans to Allstate, they were entitled to the repayment of

those loans ahead of other creditors of the corporation.

#### 1. Romano's "loans" to Allstate

Addressing the latter concern first, the evidence established that Romano

contributed monies to Allstate.   The evidence also established that the amount of the

contributions was uncertain and that the contributions were not documented

contemporaneously as loans.   The evidence further established that Allstate experienced

cash flow problems from its inception because of lack of adequate financing, a circumstance

from which this Court can infer that it was undercapitalized throughout its existence.

Indeed, one of the reasons Romano offered Farley shares of Allstate was to obtain long

term financing for Allstate to alleviate its chronic cash flow problems.

Allstate was unable to secure loans from institutional lenders without Romano's

personal guarantee.  Except for Allstate's assumption of the second mortgage on the

Romanos' personal residence, the amount of which was not set forth in the Assumption

Agreement, no written loan agreements existed between Romano and Allstate setting forth

whether the sums he advanced to Allstate were, in fact, loans or capital contributions, and

if they were intended as loans, their terms, the maturity dates and the interest rates.

Beginning in January of 2003 when the Romanos began withdrawing large sums of

cash from Allstate, Romano explained the disbursements as necessary to obtain cash to pay

creditors of Allstate.  Romano did not adequately substantiate that assertion with credible

testimony or documentary evidence.  The Court infers from the sums withdrawn that the

Romanos were attempting to recoup monies that they contributed to Allstate's operations.

The money contributed, however, must be cast as capital contributions, not loans, with the

exception of the proceeds from the second mortgage which was documented on June 14,

2002 when Allstate promised to pay Romano his obligations under the note and mortgage

secured by the West Newbury property.  This loan, however, was unsecured at that time,

and there was no attempt to secure the loan with Allstate's collateral until days before the

closing of the Sale Agreement with Casella at a time when Allstate was insolvent.  The

transfer of a security interest to Romano was fraudulent as to the unsecured creditors of

Allstate.  Without the recordation of UCC financing statements, Romano would have had

to share the net proceeds of the sale of Allstate's assets *pari passu* with other creditors of the

corporation.

2. Fiduciary duties of shareholders of closely held corporations

A closely held corporation, such as Allstate, resembles a partnership.[7] Shareholders of closely held corporations owe one another the same duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to each other.  Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 529 (1997).  *See also* Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593 (1975); Cardullo v. Landau, 329 Mass. 5, 8 (1952).  Fiduciaries, such as Farley and Romano were to each other, are prohibited from engaging in self dealing.  According to the court in Charlette v. Charlette Bros. Foundry, Inc., 59 Mass. App. Ct. 34, 43 (2003), "[s]etting one's own level of compensation, without corporate approval, is a form of self-dealing, which is subject to close scrutiny by the court." *See also* Crowley v. Communications for Hosps., Inc., 30 Mass. App. Ct. 751, 757-758 (1991);  Geller v. Allied-Lyons PLC, 42 Mass. App. Ct. 120, 122-123 (1997).

In Bessette v. Bessette, 385 Mass. 806 (1982), the Supreme Judicial Court determined that "if a majority stockholder receives corporate cash distributions and a salary in excess of the reasonable value of services rendered, the right to recover the overpayments belongs to the corporation."  385 Mass. at 809.  It explained that the fiduciary duty underlying a claim for excessive compensation is owed to the corporation and can only be  asserted as

---

[7] There is no dispute that Allstate was a closely held corporation and that Romano and Farley represented themselves as officers.  The Court presumes, but need not find, that they were both directors as well.  The corporate documents were submitted in evidence.

a stockholders' derivative action.  Id. at 809-10.

Based upon the foregoing factual and legal considerations, this Court finds that Farley established that the Romanos withdrew large sums of money from Allstate beginning in January 2003 in the form of cash or checks written to themselves in excess of the reasonable value of Romano's services measured by the level of his compensation in 2002.  This finding is based upon an examination of withdrawals from Allstate's bank accounts, deposits into the Romanos' personal checking account, the numerous checks made payable to cash or to Mrs. Romano, and the concomitant absence of evidence proffered by the Romanos that the sums which they withdrew from Allstate were actually used for the repayment of its debt.  In other words, the Romanos failed to account for the substantial sums withdrawn from Allstate.[8]  Thus, the Court finds that Farley properly

---

[8] Cf. Mass. Gen. Laws Ch. 156B, § 61, which provides the following:

Directors of a corporation who vote to authorize any distribution by the corporation to one or more of its stockholders, whether by way of a dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation, which is in violation of the corporation's articles of organization shall be jointly and severally liable to the corporation for the amount by which such distribution exceeds that which could have been made without violation of the corporation's articles of organization, but only to the extent such excess distribution is not repaid to the corporation. If the corporation is insolvent or is rendered insolvent by the making of any such distribution, whether or not in violation of the articles of organization, the directors who voted to authorize such distribution shall be jointly and severally liable to the corporation for the amount of such distribution made when the corporation is insolvent, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in either event only to the extent such distribution, or such excess, is not repaid to the corporation. In no event shall the directors who authorized any such distribution be liable under this section if such

brought and proved a case under Massachusetts law for the recovery of overpayments belonging to the corporation. The issue is whether this proof, without more, entitles him to a finding that any debts owed by the Romanos to either him or the corporation are nondischargeable under sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code. As noted by the court in Bessette, "'[t]he fairness of such [excessive] salaries is open to examination . . . for the benefit of the corporation . . . . It is immaterial in this connection whether there was actual fraud.'" 385 Mass. at 809 (citing Stratis v. Andreson, 254 Mass. 536, 539 (1926)).

In addition to the fiduciary duties shareholders of closely held corporations owe one another, corporate officers and directors owe duties to the corporation's creditors when the corporation is insolvent. In Unsecured Creditors Committee v. Noyes (In re STN Enters.), 779 F.2d 901 (2d Cir. 1985), the United States Court of Appeals for the Second Circuit observed that directors of a solvent corporation do not owe a fiduciary duty to creditors, but determined that the reverse is true when the corporation become insolvent. Id. at 904-05. See also Nahman v. Jacks (In re Jacks), 266 B.R. 728, 736 (B.A.P. 9th Cir. 2001) (California courts hold that the assets of a corporation become a trust fund for the benefit of creditors when a corporation becomes insolvent).

In Massachusetts, courts have recognized a similar rule. In Seder v. Gibbs, 333 Mass.

---

distribution could have been made without violating the articles of organization or rendering the corporation insolvent at the time when such distribution was authorized, although subsequent payment of such distribution or any part thereof causes such violation or insolvency. (Emphasis supplied).

445 (1956), the court noted that the great weight of authority established the following rule:

> "[D]irectors of a corporation which is insolvent or about to become so cannot obtain for themselves a preference over other creditors in respect to the assets [of the corporation] by taking a mortgage or other security for pre-existing debts. . . . The rule has been placed on the basis that directors are to some extent trustees of the corporation property for the creditors, that they should not be allowed to use their superior and far more intimate knowledge of the corporation's affairs to the detriment of creditors."

333 Mass at 452 (quoting Albert Richards Co., Inc. v. The Mayfair, Inc., 287 Mass. 280, 289 (1934); Burke v. Marlboro Awning Co., 330 Mass. 294, 300-301 (1953)).

Allstate was insolvent at least at the time of the sale to Casella. Romano did not rebut the evidence of Allstate's insolvency in the form of Farley's June 20, 2003 letter prepared in conjunction with the settlement of the Wheelabrator account in which he stated that Allstate's liabilities exceeded its assets. Neither Farley nor the Romanos presented any direct evidence of when Allstate became insolvent, although Farley testified that Allstate had financial problems and may have been insolvent at the time he first became associated with Romano. At least at the time of the sale to Casella, though, both Romano *and* Farley owed duties to Allstate's creditors, as well as to each other, and their decisions to take $46,000 and $84,000, respectively, from one of the escrow accounts established for the payment of Allstate's creditors constituted a breach of that fiduciary duty. Thus, the Court questions whether Farley, individually, is estopped from challenging Romano's conduct in view of his own conduct. *Cf.* Ellis v. Varney, No. 9801397, 2004 WL 574827, at *38 (Mass. Super. Jan. 9, 2004).

36

B.  Defalcation While in Acting in a Fiduciary Capacity under § 523(a)(4)

1.  Applicable Law

Section 523(a)(4) of the Bankruptcy Code provides that "[a] discharge under section

727 . . . of this title does not discharge an individual debtor from any debt . . . for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §

523(a)(4).  With respect to a defalcation, both the existence of a fiduciary relationship and

the defalcation must be proven by a preponderance of the evidence. *See* Rutanen v. Baylis

(In re Baylis), 313 F.3d 9, 17 (1st Cir. 2002); Grogan, 498 U.S. at 286-287.  In Baylis, the court

observed the following with respect to fiduciary capacity:

> Some years ago, the Supreme Court noted that under § 523(a)(4), the
> exception for fiduciary capacity applies only to express trusts, and not to
> equitable trusts created by the debtor's conduct. Davis v. Aetna Acceptance
> Co., 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Whether this
> continues to be so is in doubt. *See, e.g.*, Republic of Rwanda v. Uwimana (In
> re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001) (ambassadors are fiduciaries
> for countries they represent). It is undisputed that Baylis is a fiduciary for
> purposes of § 523(a)(4) and so this case does not present the question of when
> else a fiduciary capacity arises.

313 F.3d at 17, n3.  In Moore v. Murphy (In re Murphy), 297 B.R. 332 (Bankr. D. Mass. 2003),

the court reiterated the observation of the First Circuit:  "[t]he definition of 'fiduciary' for

purposes of § 523(a)(4) has been narrowly construed. The term applies only to relationships

arising out of express or technical trusts, and not to trusts that are implied in law as a

remedy." Id. at 348.  As a result, the existence of fiduciaries duties alone does not establish

fiduciary capacity for purposes of § 523(a)(4), Denton v. Hyman (In re Hyman), 320 B.R.

493, 510 (Bankr. S.D. N.Y. 2005), *aff'd* 335 B.R. 32 (S.D. N.Y. 2005), although "[m]ost courts

today . . . recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." <u>LSP Inv. Partnership v. Bennett (In re Bennett)</u>, 989 F.2d 779, 784-85 (5th Cir. 1993), *cert. denied*, 510 U.S. 1011 (1993).

Because a closely held corporation resembles a partnership, <u>Demoulas</u>, 424 Mass. at 529,  this Court can look to cases involving partnerships, as well as those involving closely held corporations.  In <u>Baker v. Friedman (In re Friedman)</u>, 298 B.R. 487 (Bankr. D. Mass. 2003), this Court did just that in summarizing the law with respect to "fiduciary capacity" in a dispute involving partners with reference to a Seventh Circuit decision,  <u>In re Frain</u>, 230 F.3d 1014 (7th Cir. 2000), a case under section 523(a)(4) involving a closely held corporation with three shareholders.  It stated the following:

> In . . . <u>Frain</u> . . ., the court evaluated the conduct of the debtor, Frain, the chief financial officer of a closely held, subchapter S corporation with three shareholders. Frain owned 50 % of the shares and was authorized to make day-to-day decisions, as well as all decisions affecting the normal operations of the business. 230 F.3d at 1016. Frain also was authorized to receive a salary, and the shareholders were to receive distributions of cash flow according to an agreed upon priority. Frain did not make distributions according to the specified priorities (first, federal and state income taxes, second, repayment of shareholder loans, and, finally, payments of the balance of the cash, all in proportion to the ownership interests of the shareholders). When the corporation ceased operations and Frain filed an individual Chapter 7 bankruptcy petition, the minority shareholders sued contending that the balance of the corporation's outstanding loans to them were nondischargeable under § 523(a)(4) because Frain breached his duty to them while he was acting in a fiduciary capacity. <u>Id.</u>

***

The Seventh Circuit in <u>Frain</u> "defined a fiduciary relationship under §
523(a)(4) as 'a difference in knowledge or power between fiduciary and
principal which . . . gives the former a position of ascendancy over the
latter.'" <u>Id.</u> at 1017 (quoting <u>In re Marchiando</u>, 13 F.3d 1111, 1116 (7th Cir.
1994)). With respect to Frain's conduct, it stated that his superior knowledge
of day-to-day operations was insufficient in itself to establish a position of
ascendancy. It found, however, that the concentration of power in the
corporation was substantially one-sided, that the shareholder agreement was
structured to give Frain ultimate power over both his own employment and
the direction of the corporation, that the only real limit on his power was the
chance of a deadlock, and that no major decision could be made without
Frain's agreement, including his own termination. <u>Id.</u> at 1017-18. The court
concluded that "a fiduciary relationship was created by the structure of the
corporation under the shareholder agreement," rejecting Frain's contention
that the violation a contract entered into among equals was not covered by
§ 523(a)(4). Summarizing its holding, the court stated: "A contract was
necessary to the existence of a fiduciary relationship, but the obligations of
the contract were not the source of the fiduciary relationship. The source of
the fiduciary relationship was Frain's substantial ascendancy over [the
minority shareholders]." <u>Id.</u> at 1018.

<u>Friedman</u>, 298 B.R. at 497-98 (footnote omitted).[9]  Thus, the Seventh Circuit in <u>Frain</u>

established that a fiduciary capacity for purposes of § 523(a)(4) could be established by the

existence of a contract and substantial ascendancy of one shareholder over another as an

alternative to an express or technical trust.

---

[9] According to the court in <u>In re Tsikouris</u>, 340 B.R. 604 (Bankr. N.D. Ind. 2006),
<u>Frain</u> is based upon the premise that a "fiduciary" relationship existed
between Frain and his two fellow shareholders--much as would be the
case in the relationship among a managing partner and limited partners in
a partnership--and that this relationship rose to the level of the "fiduciary
capacity" required by 11 U.S.C. § 523(a)(4) because of the structuring of
the relationship in a way which provided Frain with total control over the
focus of the fiduciary relationship: existing assets of the corporation, and
the manner in which the corporation would disburse monies on its
obligations.
340 B.R. at 616.

In <u>Friedman</u>, this Court also examined the decision in <u>Lewis v. Short (In re Short)</u>, 818 F.2d 693 (9th Cir.1987), in which the Ninth Circuit considered the business relationship between joint venturers. According to the Court in <u>Friedman</u>,

> The debtor, Short, handled the affairs of the joint venture, which was profitable. Short and his spouse, however, appropriated the profits for personal living expenses, and when Short filed a bankruptcy petition the Lewises sought an exception to his discharge under § 523(a)(4). In rejecting Short's argument that a partner is not a fiduciary, the court looked to state law, stating "[a]lthough the concept of fiduciary capacity is a narrowly defined question of federal law, state law can be consulted to determine when a trust exists." 818 F.2d at 695 (citing <u>Ragsdale v. Haller (In re Haller)</u>, 780 F.2d 794, 797 (9th Cir. 1986)). The Ninth Circuit determined that "'if state law makes clear that a partner necessarily is a trustee over partnership assets for all purposes, then that partner is a fiduciary within the narrow meaning of § 523(a)(4).'" 818 F.2d at 695 (citing <u>Haller</u>, 780 F.2d at 797). Looking to both statutory and case law, the court concluded that the debtor was a fiduciary and owed the Lewises "the obligation of candor and utmost good faith in dealings with each other" as well as undivided loyalty. <u>Id.</u> at 695.

<u>Friedman</u>, 298 B.R. at 498.

Based upon the decisions set forth above and the status of partners in Massachusetts, described in <u>Bane v. LeRoux (In re Curran)</u>, 157 B.R. 500 (Bankr. D. Mass. 1993), this Court in <u>Friedman</u> determined that partnerships satisfy the necessary elements of an express trust and that partners act in a fiduciary capacity toward each other for purposes of § 523(a)(4). <u>Friedman</u>, 298 B.R. at 499. *But see* <u>Bamco 18 v. Reeves (In re Reeves)</u>, 124 B.R. 5 (Bankr. D. N.H. 1990). The issue in this case, then, is whether the principles of partnership law apply with equal force to closely held corporations and to the situation where the corporation, as well as the 50% shareholder, is the plaintiff.

There are a number of bankruptcy cases involving disputes between 50%

shareholders and their closely held corporations, and there is understandably a divergence of opinion as to whether a disgruntled shareholder can bring suit individually or derivatively and sustain his or her burden under 11 U.S.C. § 523(a)(4).  *Compare* Rothman v. Beeber (In re Beeber), 239 B.R. 13 (Bankr. E.D. N.Y. 1999); Ferraro v. Phillips (In re Phillips), 185 B.R. 121 (Bankr. E.D. N.Y. 1995); LaPointe v. Brown (In re Brown), 131 B.R. 900 (Bankr. D. Me. 1991); *with* Chapman v. Pomainville (In re Pomainville), 254 B.R. 699 (Bankr. S.D. Ohio 2000)(absent an express trust, an action for fraud or defalcation does not arise under § 523(a)(4) even if there otherwise exists a fiduciary relationship between the parties that is recognized by state law).  *See also* Dominie v. Jones (In re Jones), 306 B.R. 352 (Bankr. N.D. Ala. 2004)(duties owed by a corporate officer and controlling shareholder in a closely-held corporation to another officer and minority shareholder are not those of a fiduciary within the meaning of § 523(a)(4)).

In In re Pomainville, the court distinguished In re Phillips, a case in which one 50% shareholder, Phillips, controlled the company books and induced the other 50% shareholder to extend credit to the corporation and to execute a personal guarantee of the corporation's debt, while at the same time taking an excessive salary and improperly causing the corporation to pay disguised personal expenditures.  In Pomainville, the court determined that, unlike the situation in Phillips, there was no evidence that plaintiff expended any of her personal funds as a result of the defendant's conduct allegedly justifying nondischargeability.  The court stated:

> [T]he damages cited by the Plaintiff are no different from the damages incurred by Advertising Plus, not Ferraro [the debtor] individually, as a

result of Phillips' misappropriations concerning salary and expenses. Under these circumstances, creditors of a corporation could be prejudiced if courts were to permit a shareholder to prosecute a direct action as opposed to a derivative suit. <u>Phillips</u>, 185 B.R. at 127-28 (where judgment to shareholder could impair the rights of creditors whose claims may be superior to that of the shareholder, derivative suit ensures equitable distribution). As a result, the Plaintiff, in her individual capacity, is not entitled to a judgment pursuant to § 523(a)(4) for the Defendant's alleged embezzlement.

<u>Pomainville</u>, 254 B.R. at 706 (citations omitted, footnote omitted).

2. Analysis

Even assuming this Court were to extend the holdings in <u>Friedman</u> and <u>Curran</u> to the instant case, the decisions in <u>Phillips</u> and <u>Pomainville</u>, cited above, highlight the difficulties surrounding the  issue of Romano's alleged defalcation while acting in a fiduciary capacity.  Although Romano owed his fellow shareholder a fiduciary duty, he also owed a fiduciary duty to Allstate and a judgment in favor of Farley could impair the rights of creditors of Allstate whose claims against Allstate's assets are superior to those of both Romano and Farley.  Accordingly, the issue is whether the generalized  fiduciary duty owed to Farley and Allstate by Romano were " imbued with attributes giving rise to, in substance, a trust," <u>In re Brown</u>, 131 B.R. at 905, or whether Romano was in a position of substantial ascendancy" over Farley.  <u>In re Frain</u>, 230 F.3d at 1018. As the court in <u>Brown</u> noted, the "[c]haracteristics of an express trust include an explicit declaration of the creation of a trust, a clearly defined trust res, and an intent to create a trust relationship." 131 B.R. at 105.

The Court finds that no express trust existed with respect to Romano's fiduciary duty to Farley.  Moreover, the Court finds that unlike the situation in <u>Frain</u>, the various

42

agreements executed by Farley and Romano in May of 2002 did not give Romano more

"knowledge or power" than Farley, and Romano did not hold a position of ascendency

over Farley.  As Controller, Farley had a duty to exert his authority to obtain appropriate

controls over the corporate bank accounts, check writing and the reconciliation of the

accounts.  While acceding to the Romanos' past practices and without being in a position

to fully understand Allstate's financial affairs, he nevertheless infused monies into Allstate.

Based upon the decisions in <u>Friedman</u> and <u>Frain</u>, no express trust was created with respect

to the funds advanced to Allstate by Farley. There was no evidence Romano prevented

Farley from performing his duties.  Rather, there was testimony that Farley was difficult

to reach and at least for a time was debilitated by an illness. Moreover, once Farley's health

improved, he had access to the Banknorth statements and other financial records.

Although the Court cannot find that Romano committed fraud or a defalcation

while acting in a fiduciary capacity vis a vis Farley, the situation, however, is different with

respect to Allstate and the escrow accounts created for the proceeds realized from the sale

of Allstate's assets to Casella.

Under Massachusetts common law, as stated in <u>Seder</u>, 333 Mass. at 452, when a

corporation is insolvent, its directors hold its assets in trust for the corporation's creditors.

The escrow accounts created pursuant to the Sale Agreement with Casella contained funds,

which were segregated and earmarked for particular classes of creditors of Allstate.  The

escrow accounts existed prior to Romano's decision to obtain funds for his personal benefit

at a time when Allstate was insolvent.  Accordingly, the evidence established that

Romano's conduct with respect to the funds used to satisfy the second mortgage on his home constituted fraud and defalcation while acting in a fiduciary capacity with respect to the creditors of Allstate.  Romano had a duty to act in the best interest of Allstate which had an obligation to equitably satisfy the claims of its creditors without preference to its shareholders.  By authorizing Attorney Raffa to satisfy Allstate's obligation related to the second mortgage on the West Newbury property, Romano harmed the creditors of Allstate.  Nevertheless, at the time Romano requested a check from Attorney Raffa from the UCC Escrow, Allstate's obligation with respect to the second mortgage was subject to security interest that was avoidable as a fraudulent transfer, but not void.  Thus, it is unclear whether in a shareholder derivative suit Allstate could recover for the harm caused its creditors.  Because Farley neither recognized nor addressed this issue, the Court declines to enter judgment under § 523(a)(4) in favor of Allstate.

Finally, Farley failed to sustain his burden with respect to Mrs. Romano under 11 U.S.C. § 523(a)(4).  The Romanos rightfully point out that at no time was Mrs. Romano an officer or shareholder of Allstate, and therefore owed no fiduciary duties to the corporation or to Farley.

C.  Embezzlement under § 523(a)(4)

1.  Applicable Law

Section 523(a)(4) of the Bankruptcy Code provides that a debtor may not discharge debt for embezzlement or larceny.  Embezzlement has been defined "as the fraudulent appropriation of property of another by a person to whom such property has been

44

entrusted or into whose hands it has lawfully come." <u>Moore v. United States</u>, 160 U.S. 268, 269 (1895).[10]  Embezzlement does not require the existence of a fiduciary relationship. <u>Pomainville</u>, 254 B.R. at 704 (citing <u>PaineWebber, Inc. v. Magisano (In re Magisano)</u>, 228 B.R. 187, 190 (Bankr. S.D. Ohio 1998).

According to the court in <u>KMK Factoring, L.L.C. v. McKnew (In re McKnew)</u>, 270 B.R. 593 (Bankr. E.D. Va. 2001),

> To establish embezzlement, the plaintiffs must prove (1) the debtor's appropriation of property was for the debtor's benefit and (2) the appropriation occurred with fraudulent intent or by deceit. <u>Weigend v. Chwat (In re Chwat)</u>, 203 B.R. 242, 247 (Bankr. E.D. Va. 1996) (citing <u>Clark v. Taylor (In re Taylor)</u>, 58 B.R. 849, 855 (Bankr. E.D. Va. 1986)). Thus, in order to prevail, a creditor must establish that the debtor appropriated the funds with fraudulent intent; "[e]ven where a case might imply some sort of trust by virtue of a debtor holding funds for another, the debtor's subsequent appropriation of the funds will not amount to an embezzlement absent proof of the debtor's fraudulent intent." <u>Hall v. Blanton (In re Blanton)</u>, 149 B.R. 393, 394 (Bankr. E.D. Va. 1992) (quoting <u>Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)</u>, 52 B.R. 901, 905 (Bankr. E.D. Va. 1985)). The court may infer intent from the debtor's actions and surrounding circumstances. <u>Id.</u> (citing <u>Moonan v. Bevilacqua (In re Bevilacqua)</u>, 53 B.R. 331, 334 (Bankr. S.D. N.Y. 1985)); *see also* <u>In re Chwat</u>, 203 B.R. at 249. The proper inquiry for the court concerning the intent of the debtor is whether there is "intent to convert, not intent to harm." <u>In re Taylor</u>, 58 B.R. at 855. Thus, ill will toward the plaintiff is unnecessary and a plaintiff "need not prove that the debtor acted out of spite, ill will, or hatred in order to prove embezzlement within the meaning of section 523(a)(A)." <u>Id.</u>

<u>In re McKnew</u>, 270 B.R. at 631-32.

Courts have found embezzlement to exist in the context of corporate officers' and

---

[10] Larceny is distinguished from embezzlement in that the debtor's original acquisition of possession was unlawful.  <u>Consumer United Ins. Co. v. Bustamante (In re Bustamante)</u>, 239 B.R. 770, 777 (Bankr. N.D. Ohio).

directors' unauthorized withdrawal of corporate funds as compensation. <u>McKnew</u>, 270

B.R. at 634; <u>Ferraro v. Phillips (In re Phillips)</u>, 185 B.R. 121, 129 (Bankr. E.D. N.Y. 1995); <u>Hall</u>

<u>v. Johann (In re Johann)</u>, 125 B.R. 679, 681-682 (Bankr. M.D. Fla. 1991).  Where the officer's

compensation is established  by agreement, any funds taken in excess of that constitute

embezzlement for purposes of 11 U.S.C. § 523(a)(4).  <u>McKnew</u>, 270 B.R. at 595 (officer's

compensation fixed at $10,000 per month so long as the company's profits could support

it); <u>Phillips</u>, 185 B.R. at 123 (parties agreed to a weekly salary of $500).  In contrast, where

a debtor was entitled under his employment agreement to pay himself bonuses without

restriction as long as the company was profitable, the court found the plaintiff could not

show such bonuses were embezzled.  <u>Allentown Supply Co. v. McCurdy (In re McCurdy)</u>,

45 B.R. 728, 731-732 (Bankr. M.D. Pa. 1985).  The focus of analysis in all cases is what the

debtor's employment agreement permits with regard to compensation.

　　　2.  Analysis

　　　In the present case, Farley, individually and derivatively on behalf of Allstate, seeks

a determination that the Romanos embezzled funds from Allstate.  The circumstances

surrounding the Romanos' decision to write checks to themselves and for cash establishes

that they embezzled funds from Allstate.  Romano was entitled to a regular salary.  Beyond

entitlement to equal salaries, the Employment Agreements did not specify fixed salaries

for Farley and Romano, and there were no restrictions on the amount of Romano's

compensation.   Nevertheless, as with all contracts, the Employment Agreement between

Romano and Allstate included a covenant of good faith and fair dealing, <u>Anthony's Pier</u>

Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991), and was subject to a reasonableness standard.  In short, Romano was entitled to reasonable value of he services, Bessette, 385 Mass. at 809, he was not entitled to dramatically increase  his compensation in a thinly disguised attempt to recoup his capital contributions, and, in the process, deprive Allstate of cash needed to satisfy the legitimate obligations of its creditors  while the company was in the zone of insolvency or insolvent.

Allstate's bank records compel the conclusion that as its financial condition deteriorated, Romano, with Mrs. Romano's assistance, systematically and dramatically increased the level of withdrawals from Allstate's bank accounts.  While Romano testified that he withdrew monies to pay dumps and other obligations of Allstate, he could not corroborate his testimony with a single receipt, and no creditors testified, other than Emery, that they would only accept cash from Allstate.  Moreover, as withdrawals from Allstate's bank accounts increased, deposits into the Romanos' personal checking account also increased.  As further evidence of Romano's fraudulent intent, he secured Allstate's obligation to pay the second mortgage on the West Newbury property within days of the closing of the sale of Allstate's assets to Casella and obtained $84,000 to satisfy that obligation from an escrow account established for the benefit of Allstate's existing secured creditors.  Romano's testimony that he obtained cash to pay Allstate's debts simply was not credible in view of the magnitude of Allstate's debt and the absence of any receipts for cash payments, as well as the acceptance of corporate checks by the waste dumps used by Allstate in the early part of 2003.

47

Under Massachusetts law, an agency relationship cannot arise solely on the basis of a marital relationship between a husband and a wife.  With respect to the operations of Allstate, however, the evidence established that Romano authorized Mrs. Romano to sign his name to Allstate's checks and that Mrs. Romano acquiesced in and benefitted from the distributions made by Allstate for their benefit.  *See* Gordon v. O'Brien. 320 Mass. 739, 741-42 (1947).  In short, she ratified his fraudulent conduct and embezzlement, and, therefore, is liable with him under 11 U.S.C. § 523(a)(4).

    D.  <u>False Pretenses, False Representation, and Actual Fraud under § 523(a)(2)</u>

       1.  Applicable Law

A debt shall be excepted from discharge under 11 U.S.C. § 523(a)(2) when the debt is "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud." A debt is nondischargeable under this subsection when it is the result of the debtor's false statement, made with knowledge of its falsity, with the intent to deceive the creditor, and where the creditor justifiably relies on the representation to its detriment.  <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786-787 (1st Cir. 1997); <u>Reilly v. Beeman (In re Beeman)</u>, 225 B.R. 522, 528 (Bankr. D. N.H. 1998).  The plaintiff bears the burden of proving each and every element of an exception to discharge by a preponderance of the evidence.  <u>Grogan v. Garner</u>, 498 U.S. 279 (1991).

According to the First Circuit, "the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." <u>Palmacci v. Umpierrez</u>, 121 F.3d at 786. The court elaborated:  The test may be stated as follows.

48

> If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

Id. at 787 (citations omitted, emphasis omitted).  Moreover, "[a]n intent to deceive is proven when a debtor makes a misrepresentation '. . . which any reasonable person would know would induce another to act.'"  Drake Capital Sec., Inc. v. Larkin (In re Larkin), 189 B.R. 234, 240 (Bankr. D. Mass. 1995)(quoting In re Pommerer, 10 B.R. 935, 940 (D. Minn. 1981)).  Under certain circumstances, silence may constitute a false representation where the debtor failed to disclose a material fact that he or she was bound to reveal.  Larkin, 189 B.R. at 239 (citing In re Van Horne, 823 F.2d 1285, 1288 (8th Cir. 1987)); see also Bombardier Capital, Inc. v. Baietti (In re Baietti), 189 B.R. 549, 554 (Bankr. D. Me. 1995); Dean Witter Reynolds Inc. v. Printy (In re Printy), 188 B.R. 61, 72 n.6 (Bankr. D. Mass. 1995), aff'd, 110 F.3d 853 (1st Cir. 1997).

Justifiable reliance, a critical element of proof under § 523(a)(2)(A), requires only that the falsity of the representation not be obvious to someone of the plaintiff's knowledge and intelligence.  Field v. Mans, 516 U.S. 59, 70 (1995); Baietti, 189 B.R. at 553 (one is required to use his senses, and cannot recover if he blindly relies where falsity would be patent upon a cursory examination).

2.  Analysis

Upon consideration of the case law cited above and the facts established at trial, the Court concludes that Farley has failed to satisfy his burden of proof with respect to the

49

elements 11 U.S.C. § 523(a)(2)(A).  Farley's testimony was devoid of specificity.  Moreover,

Romano's representations, false or not, did not induce Farley to loan money to Romano;

rather, Farley lent or contributed money to Allstate.  Although he testified to general

statements made by Romano, asserting that Romano made promises of repayment every

time he asked Farley for money, the Court finds that Farley's apparent confusion as to

what constituted a capital contribution and a loan confounds the analysis.  In the first place,

neither Farley nor Romano testified to meetings or conversations at which they charted

company policy.   Rather, it appears that they operated independently with  Romano

intermittently requesting funds from Farley, and with Farley periodically satisfying certain

outstanding bills.

    The evidence presented at trial established that the Romanos used Allstate's bank

accounts at Danvers Savings Bank and at Banknorth to pay their personal expenses.  Farley

was aware of their practice at the time he elected to become a shareholder of Allstate and

either was powerless to stop it or chose not to do so.  Despite his business experience as an

accountant and management consultant, he failed to implement or maintain any systems

to ensure that Allstate's checking accounts were used exclusively for business purposes,

that check writing authority was restricted to those persons with actual corporate

authority, that the date and amount of checks were immediately recorded in one place, and

that bank statements were reconciled on a timely basis.  In view of the fundamental flaws

in Allstate's business operations and record keeping, which Farley either tolerated or could

not rectify, as well as Allstate's history of losses or *de minimis* profit as reflected in its

federal tax returns, a critical issue in this case is whether Farley could justifiably rely upon any statements or promises purportedly made by Romano that he and Farley would "equalize" compensation and benefits or that Romano would repay Farley for the sums he contributed to Allstate's operations. Farley, as an accountant and management consultant had to know that the corporate creditors would have to be paid before the shareholders could recover their capital contributions. Romano's disorganized business practices were well-known. Obviously, if Farley could not assess the actual financial condition of Allstate at any given point in time with his accounting and management background, Romano could not do so either. Accordingly, any statements made by Romano as to Allstate's financial condition would be unreliable.

As the Romanos' accountant, Farley had to have been aware that Romano would be unable to personally repay any loans other than from his compensation or distributions from Allstate, which had serious cash flow problems. Accordingly, the Court finds that even if Romano promised to repay all of Farley's loans with fraudulent intent, Farley was not justified in relying upon Romano's statements because he was aware of Allstate's financial problems and Romano's pre-existing guarantees to other lenders. In short, the Court finds that Farley failed to demonstrate that Romano's alleged promises to personally guarantee his unpaid loans constituted false representations upon which he could justifiably rely.

Farley also asserted that Romano demanded contributions from him, representing that the company was out of cash and that its creditors would only accept cash payments,

51

while Romano was simultaneously withdrawing large sums of money from the corporation

for his personal benefit.  Farley, however, admitted that he did not question Romano about

the large amounts of money he was taking from the corporation until after the withdrawals

had been made, at which time Romano represented that cash was needed to pay the

dumps.  Under these circumstances, any misrepresentations made by Romano did not

induce Farley to act.  Rather, it would appear that the large number of insufficient funds

checks and Allstate's chronic cash flow problems induced Farley to contribute the money

to the company's operations, rather than any specific statements by Romano that an

infusion of money was required to pay dumps.  Moreover, to the extent that Farley

contended that Romano represented that Allstate was out of cash and needed money, the

Court finds that this was not false.  According to Farley's own representation to

Wheelabrator, Allstate was insolvent, and, therefore, in desperate need of cash.

(Defendant's Exhibit 11).

The Court finds that Farley's assertions that he never would have invested in or

loaned money to Allstate had he known the full extent of Romano's withdrawals of cash

to be less than credible.  Farley's only chance of recouping his initial investment was

through a sale.  Therefore, Farley's "loans" to reach "the finish line" were generated as

much by self-interest as by any representations by Romano.

Farley's allegation that Romano lied when he agreed that they would equalize

distributions when the company was profitable or sold suffers from a similar defects.

Farley produced no evidence that Romano lacked the intention to equalize distributions

at the time he promised to do so.  Both Romano and Farley testified that Romano was not financially sophisticated.   As such, the Court cannot find that Romano's promise to equalize distributions was made with an intent to deceive.  Moreover, as an accountant, Farley was not justified in relying upon any such promise once Allstate entered the zone of insolvency, as creditors of the corporation would have to be paid before shareholders could "equalize" distributions.  Because Farley  knew Allstate was in perilous financial condition and was insolvent near and at the time of the sale to Casella, Farley, as the company's Controller, could not have justifiably relied on Romano's statements because Allstate lacked funds to both pay its creditors and repay him his contributions by "equalizing distributions."  Moreover, Farley did not go so far as to argue that he was aware that Romano was improperly obtaining Allstate's available cash prior to the sale to Casella and that Romano breached a promise to share his ill-gotten gain with him.

With respect to Romano's conduct in obtaining repayment of the second mortgage on West Newbury property from the escrow account, the Court also finds that Farley failed to satisfy his burden of proof.  For an actionable false misrepresentation to arise from silence, Farley was required to demonstrate that Romano was under a duty to disclose his intention to obtain payment of the second mortgage on the West Newbury property. Romano owed Farley such a duty to disclose, but Farley ratified Romano's conduct when he authorized Attorney Raffa to write him a check for $46,000 from the same escrow account with respect to the alleged loans he made to Allstate. At the time the funds were disbursed, Allstate was insolvent.  While Romano's obligation to the Institution for Savings

53

had been assumed by Allstate, and apparently secured by UCC filings made by Attorney Raffa, its obligations to Farley were not memorialized in writing or accompanied by any financial statements or UCC filings. Accordingly, both the payment to Farley and the payment to Romano were fraudulent as to Allstate's creditors. As such Farley, individually, cannot recover for any such "misrepresentation." In short, he is estopped from challenging Romano's conduct in view of his own similar conduct.

Finally, Farley submitted no evidence that Mrs. Romano made any false statements to either him or to Allstate and she obtained no monies directly from him. Moreover, Farley did not expressly argue that she would be liable to him as Romano's agent.

E. Objection to the Homestead Exemption

1. Applicable Law

Romano claimed a homestead pursuant to Mass. Gen. Laws Ch. 188, § 1 which provides in relevant part: "An estate of homestead . . . in the land and buildings may be acquired pursuant to this chapter by an owner or owners of a home or one or all who rightfully possess the premise by lease or otherwise and who occupy or intend to occupy said home as a principal residence. . . ." Fed. R. Bankr. P. 4003(c) provides that the burden is on the creditor to prove that the exemption is not properly claimed.

2. Analysis

Farley objected to Romano's homestead based upon the same prepetition conduct, which gave rise to his claims under 11 U.S.C. § 523(a)(2)(A) and (4), citing Carlson Orchards, Inv. v. Linsey (In re Linsey), 296 B.R. 582 (Bankr. D. Mass. 2003). Farley did not

54

establish that Romano acquired the West Newbury property with embezzled funds. Therefore, <u>Linsey</u>, a case in which the bankruptcy court imposed a constructive trust with respect to property acquired with embezzled funds, is distinguishable from the instant case. Moreover Farley did not set forth or prove grounds for objecting the Romano's homestead under 11 U.S.C. § 522(c). Accordingly, he failed to sustain his objection to the Debtor's homestead as the First Circuit's decision in <u>Patriot Portfolio, LLC v. Weinstein</u>, 164 F.3d. 677 (1st Cir. 1999), precludes the relief requested by Farley.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Allstate and against the Romanos for embezzlement with respect to the excessive compensation obtained by Romano and Mrs. Romano. The Court shall enter judgment in favor of the Romanos and against Farley with respect to Farley's remaining claims under 11 U.S.C. § 523(a)(2)(A) and (4).

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: October 30, 2006
cc: Daniel A. Laufer, Esq., Mark W. Griffin, Esq.